## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| DENNIS BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket no. 1:11-cv-00179-NT |
| | ) | |
| STATE OF MAINE COMMISSION | ) | |
| ON GOVERNMENTAL ETHICS | ) | |
| AND ELECTION PRACTICES, | ) | |
| | ) | |
| Defendant, and | ) | |
| | ) | |
| ELIOT CUTLER, | ) | |
| | ) | |
| Intervenor-Defendant. | ) | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

## INTRODUCTION

On January 31, 2011, the Maine Commission on Governmental Ethics and Election Practices (the "**Commission**") fined the Plaintiff, Dennis Bailey, $200 for failing to provide his name and address on "the Cutler Files," his anonymous website advocating the defeat of gubernatorial candidate Eliot Cutler. The Commission found Bailey in violation of 21-A M.R.S.A. § 1014, which requires that election advocacy communications: (1) state the name and address of the person financing the communication; and (2) state whether the communication is authorized by a candidate. The Plaintiff appealed the Commission's action in Cumberland County Superior Court pursuant to Maine Rule of Civil Procedure 80C and 5 M.R.S.A. § 11002. Pursuant to Rule 80C(i), the Plaintiff joined three

independent constitutional claims challenging section 1014 as applied to him. He claims that section 1014's attribution and disclaimer requirements: (1) impermissibly burden his right to speak anonymously; (2) discriminate against him as a citizen journalist and internet news source; and (3) are unconstitutional as applied to his *de minimis* expenditure. Eliot Cutler intervened, removed the case to this Court, and filed for summary judgment. Shortly thereafter, the Plaintiff and the Commission filed cross-motions for summary judgment. These three motions are now before the Court. For the following reasons, the Plaintiff's Motion for Summary Judgment is **DENIED** and the Defendants' Motions for Summary Judgment are **GRANTED**.

## I.      Background

### A. Relevant Provisions of 2010 Maine Election Law

The Plaintiff's suit is based on the application of Maine's 2010[1] disclosure requirements[2] to the Cutler Files website. The disclosure requirements of 21-A M.R.S.A. § 1014(2) apply to expenditures[3] not authorized by a candidate,[4] financing communications[5] "expressly advocating the election or defeat of a clearly identified

---

[1]      Maine's election laws have been amended to exempt internet and email activities costing less than $100. P.L. 2011, ch. 689, § 13 (codified as amended at 21-A M.R.S.A. § 1014(6)(C) (Supp. 2011)). Of course, the Court applies the law in effect at the time of the 2010 gubernatorial election.

[2]      The Court refers to both the attribution and disclaimer requirements found in section 1014 as the "disclosure requirements."

[3]      An expenditure includes: "A purchase, payment, distribution, loan, advance, deposit or gift of money or anything of value made for the purpose of influencing the nomination or election of any person to political office . . . ." 21-A M.R.S.A. § 1012(3)(A)(1).

[4]      Section 1011 provides: "This subchapter applies to candidates for all state and county offices and to campaigns for their nomination and election." 21-A M.R.S.A. § 1011. This section was subsequently amended to include candidates for municipal office. P.L. 2009, ch. 366, § 1.

[5]      The statute applies to communications made "through broadcasting stations, newspapers, magazines, campaign signs or other outdoor advertising facilities, publicly accessible sites on the

candidate." 21-A M.R.S.A. 1014(1). If in written form, these communications must contain the words "NOT PAID FOR OR AUTHORIZED BY ANY CANDIDATE" (the disclaimer requirement) and must provide the name and address of the person who made or financed the expenditure for the communication (the attribution requirement). 21-A M.R.S.A. § 1014(2). The disclosure requirements also apply to an expenditure made for a communication that clearly identifies a candidate and that is disseminated closer to an election to influence that election. 21-A M.R.S.A. § 1014(2-A).[6]

Section 1012 contains a press exemption which excludes from the definition of "expenditure," "any news story, commentary or editorial distributed through the facilities of any broadcasting station, newspaper, magazine or other periodical publication, unless the facilities are owned or controlled by any political party, political committee, candidate or candidate's immediate family." 21-A M.R.S.A. § 1012(3)(B)(1).

A person making independent expenditures aggregating in excess of $100 during an election must file a detailed, itemized report with the Commission with a

---

Internet, direct mails or other similar types of general public political advertising or through flyers, handbills, bumper stickers and other nonperiodical publications . . . ." 21-A M.R.S.A. § 1014(1).

[6]     Whenever a person makes an expenditure to finance a communication that names or depicts a clearly identified candidate and that is disseminated during the 21 days before a primary election or 35 days before a general election through the media described in subsection 1, the communication must state the name and address of the person who made or financed the communication and a statement that the communication was or was not authorized by the candidate. The disclosure is not required if the communication was not made for the purpose of influencing the candidate's nomination for election or election.

21-A M.R.S.A. § 1014(2-A).

statement made under oath or affirmation stating whether the expenditure was made in cooperation with a candidate. 21-A M.R.S.A. § 1019-B.

Section 1014(4) permits fines of up to $200 for violations of section 1014 within twenty days prior to an election and fines of up to $100 for violations made outside of twenty days prior to an election that are not corrected within 10 days of notice of the violation. 21-A M.R.S.A. § 1014(4).

### B. Facts

#### 1. The 2010 Election and the Cutler Files Website

The Plaintiff, Dennis Bailey, is a well-known figure in Maine state politics and the owner and principal of Savvy, Inc., a public relations firm, which he founded in 2000, and which describes itself as "Maine's premier public relations firm offering professional expertise in media and public relations, crisis communications, political campaign management, speechwriting and more." Defendants' Joint Statement of Material Facts ¶ 5 ("**DJSMF**") (Doc. 70). Bailey owns and controls a personal blog called "SavvySpin" on which he periodically posts news and commentary. The Savvy, Inc. website contains a link to the "SavvySpin" blog.

Bailey has a degree in journalism from the University of Maine and has worked in both journalism and politics. Bailey worked as a reporter for several Maine newspapers and as a freelance reporter for several national publications. In the '90s, Bailey worked as press secretary for Maine U.S. Congressman Tom Andrews; press secretary for Maine gubernatorial candidate Tom Allen; press

secretary and political advisor for Angus King during his first campaign for governor; and press secretary, policy advisor, and speech writer for Governor King after the election. In September of 2009, Bailey was hired as a political consultant by the Rosa Scarcelli gubernatorial campaign. The Rosa for Maine campaign paid Bailey a total of $33,000 for his services in the primary election campaign.

In late summer of 2009, when Scarcelli's husband Thomas Rhoads[7] learned that Eliot Cutler was going to enter the race for governor, he began downloading negative articles on Cutler from the internet. In October of 2009, Rhoads drafted a document entitled "Top Ten Eliot Cutler Vulnerabilities," which he emailed to Bailey.

Scarcelli lost the Democratic primary on June 8, 2010, but Cutler remained in the race as an independent. Following Scarcelli's loss, Scarcelli and Rhoads tried unsuccessfully to sell Rhoads's research to Democratic gubernatorial candidate Libby Mitchell's campaign for $30,000.[8] After Scarcelli's primary defeat, independent gubernatorial candidate Shawn Moody hired Bailey to work for his

---

[7]     In his Response to the Defendants' Joint Statement of Material Facts, the Plaintiff requested that the Court strike as irrelevant over 100 of the Defendants' factual statements mostly linking 2010 Democratic gubernatorial primary candidate Rosa Scarcelli and her husband Thomas Rhoads to the Cutler Files website. The Court agrees that many of the challenged facts are not relevant to the Plaintiff's legal claims. However, the Court has included some facts about Rhoads's research on Eliot Cutler because they are relevant to the Court's analysis. To the extent the Court relies on these facts, the Plaintiff's objections are **OVERRULED** and his motion to strike is **DENIED**.

[8]     Rhoads and Scarcelli asked for $30,000 because of the amount of time that Rhoads spent compiling the articles and because Link Strategies had charged the Scarcelli campaign $30,000 for similar material.

campaign.[9] Moody's campaign paid Bailey $35,000 for his services during the general election.

In July of 2010, Bailey and Rhoads discussed posting their research on Cutler on an anonymous website. Bailey created a mockup of what was to become the Cutler Files website, which included content written by Rhoads and Bailey. Bailey e-mailed the Cutler Files mockup to Rhoads on July 15, 2010 and spent about three days at the beginning of August creating the Cutler Files website using software on his computer.

On August 4, 2010, Bailey registered a domain name, www.cutlerfiles.com, and paid the registration fee and the fee for two months of web hosting through Savvy, Inc. The Cutler Files website became publicly accessible on August 30, 2010. It did not include a statement identifying the name of the person who made or financed the website or a statement that the website was not authorized by any candidate.

On September 9 or 10, 2010, the following statement appeared on the bottom of the Cutler Files home page:

> Who we are: We are a group of researchers, writers and journalists who are frustrated that Maine's mainstream media is either unwilling or incapable of adequately investigating the backgrounds of candidates for higher office. We are not authorized by or affiliated with any candidate or political party, and we have not been compensated in any way for our effort.

---

[9]      On July 6, 2010, Bailey wrote a post critical of Cutler on SavvySpin entitled "Eliot Cutler Called Me a Whore," which responded to a sarcastic email that Cutler had sent Scarcelli after Bailey began to work on the Moody campaign.

DJSMF ¶ 135. The statement included contact information for Waterville, Maine attorney Daniel Billings. The disclaimer "NOT PAID FOR OR AUTHORIZED BY ANY CANDIDATE" also appeared at this time on the bottom of the home page and on several other pages of the site.

The parties dispute how frequently Bailey added content to the website or otherwise changed the site. However, the parties agree that the content was complete as of September 29, 2010, when the Cutler Files website consisted of the home page and nine additional pages on different topics related to Cutler. On the home page of the Cutler Files in place as of September 1, 2010, the website stated:

> Over the next several weeks, THE SECRET FILE ON ELIOT CUTLER will reveal the facts about his life, facts you'll find nowhere else, to help voters see the full picture of the man – his arrogance and ego, his ties to big corporations and foreign countries and how he has spent a lifetime working directly against the interests of Maine and the US. You'll see why Cutler is unfit to be Maine's next governor.[10]

DJSMF ¶ 129. When the website content was complete, the home page had links to the nine additional topics, which were entitled: "The Bangor Bison," "Cutler in Maine," "Saying 'NO' at OMB," "Cutler in DC," "China's Lobbyist," "The Thornburg Mess," "Eliot's Fantasy," "Reward Offered," and "Cutler in Long Underwear."

The Cutler Files website was discontinued on October 29, 2010, four days before the November 2, 2010 general election for governor. The monthly web hosting fee for November 2010 would have been due on October 29, 2010. Defendants' Joint Statement of Additional Material Facts (**"JSAMF"**) ¶ 202 (Doc.

---

[10]    The last line of this paragraph referring to Cutler's fitness for Governor was deleted from the Cutler Files home page at some point between the version of the home page dated September 1, 2010, Doc. 70-69 at 1, and the version of the homepage dated October 4, 2010, Doc. 70-64 at 2.

82). During the two months in which the Cutler Files website was publicly accessible, visitors to the site made 46,989 page requests.

After it became public that Bailey had created the Cutler Files website,[11] Bailey received three or four anonymous voicemail messages on his office phone. Bailey reports that his secretary quit after he went public as the Cutler Files creator because "[t]he situation became so uncomfortable and intolerable." Bailey Declaration ¶ 50 (Doc. 73-1). Bailey testified that in the voicemails:

> They called me names, jerk, asshole, coward. They said, we hope you fail in everything you do, you should leave the state, you're scum. Those kinds of things . . . there was one where the guy said I'm going to do everything I can to make sure you fail, which I took as a threat. I don't know what that means. You know, what is he going to do?

Bailey Dep. 209:21-25, 210-211, 212:1 (Doc. 82-5). Bailey testified that "they were really mad at me for being anonymous." Bailey Dep. 210:2-4.

## 2.  Proceedings Before the Commission

On September 7, 2010, the Cutler campaign filed a complaint with the Commission requesting an investigation into the Cutler Files website and potential violations of the Maine election laws. At a public meeting on September 9, 2010, the Commission authorized an investigation by Commission staff into the Cutler Files website.

Based on invoices Rhoads and Bailey provided to the Commission, the Commission determined that Bailey had spent $91.38 to create and publish the Cutler Files, less than the $100 threshold for section 1019-B's reporting

---

[11]    Bailey publicly revealed himself as the Cutler Files creator shortly after the Commission's December 16, 2010 meeting finding the Cutler Files in violation of section 1014.

requirements. This total included the domain name registration cost, two months of web hosting fees, and the price of research materials used for the site's content, including articles downloaded from the internet and documents obtained from the Cumberland County Registry of Deeds.

The Commission found Bailey, whose identity the Commission protected, in violation of 21-A M.R.S.A. §§ 1014(2) and (2-A). The Commission determined that Bailey had designed the website, edited all of the content, and made all modifications to the website, though it found that Rhoads had contributed some content. The Commission found no evidence suggesting that a gubernatorial candidate in the 2010 general election had authorized the website. The Commission also determined that expenditures for the Cutler Files were not excluded from 1014(2) and (2-A) under the press exemption because it found that the Cutler Files website was not a periodical publication. The Commission concluded that the website expressly advocated for Eliot Cutler's defeat up to the gubernatorial election, bringing it under sections 1014(2) and (2-A). The Commission concluded that the website did not have a disclaimer from August 30 to September 9 or 10 or provide attribution from August 30 to October 29, in violation of 1014(2) and (2-A). The Commission finally determined that the $91.38 expended in creating the Cutler Files was not *de minimis* but did not reach the $100 threshold for section 1019-B's reporting requirements. Bailey was fined $200 for his violations of sections 1014(2) and (2-A).

## DISCUSSION

### I. The Constitutional Claims – Counts I, III and IV

#### A.    Summary Judgment Standard

For purposes of the parties' cross-motions for summary judgment on the Plaintiff's independent constitutional claims brought under 42 U.S.C. § 1983, the Court may consider all the evidence in the record gathered during discovery, and it is not limited to the record before the Commission. Fed. R. Civ. P. 56(c); *Baker's Table, Inc. v. City of Portland*, 743 A.2d 237, 241 (Me. 2000).

Under Federal Rule of Civil Procedure 56, the Court shall grant summary judgment if the movant shows "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In applying this principle, it is important to bear in mind that not every genuine factual conflict necessitates a trial. It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared." *Martinez v. Colon*, 54 F.3d 980, 984 (1st Cir. 1995).

If the moving party will not bear the burden of proof at trial, the moving party can make a *prima facie* case that it is entitled to summary judgment by either submitting evidence that negates an essential element of the nonmoving party's claim, or demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party may defeat the movant's *prima facie* entitlement

10

to summary judgment by demonstrating to the Court specific facts in the record overlooked or ignored by the moving party that support the essential elements of the party's claim. *Id.* at 324; *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.   Count I: First Amendment Challenge to Application of Section 1014

In Count I, the Plaintiff alleges that the Commission's application of section 1014's attribution requirement is unconstitutional under the First Amendment of the U.S. Constitution,[12] Article I, Section 4 of the Maine Constitution,[13] and 42 U.S.C. § 1983[14] because it impermissibly burdens his right to speak anonymously.

Laws like section 1014 require disclosure of information by those engaging in political speech but do not prohibit or otherwise restrict the content of political speech. The seminal case in this area is *Buckley v. Valeo*, 424 U.S. 1 (1976), wherein the Supreme Court addressed challenges to the Federal Election Campaign Act (FECA) and its contribution and expenditure limits and reporting and disclosure requirements.[15] The Supreme Court applied strict scrutiny to FECA's limitations on

---

[12]     "Congress shall make no law  . . . abridging the freedom of speech, or of the press . . . ." U.S. Const. amend. I.

[13]     "Every citizen may freely speak, write and publish sentiments on any subject, being responsible for the abuse of this liberty; no laws shall be passed regulating or restraining the freedom of the press . . . ." Me Const. art. I, § 4. Section 4 of the Maine Constitution is "no less restrictive than the Federal Constitution." *City of Bangor v. Diva's, Inc.*, 830 A.2d 989, 902 (Me. 2003) (quoting *State v. Janisczak*, 579 A.2d 736, 740 (Me. 1990)).

[14]     "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983.

[15]     In addition to data collection and reporting requirements which included the name and addresses of donors to political committees and candidates, FECA required every individual who made a contribution or expenditure of over $100 in a calendar year to file a statement with the FEC.

11

contributions and expenditures, but it used "exacting scrutiny" to analyze FECA's reporting requirements. Acknowledging that "compelled disclosure has the potential for substantially infringing the exercise of First Amendment rights," the Supreme Court explained that a slightly less rigorous standard was appropriate because "[u]nlike the overall limitations on contributions and expenditures, the disclosure requirements impose no ceiling on campaign-related activities." *Id.* at 67, 64. Under exacting scrutiny, there must "be a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed." *Id.* at 64. The Court found that the disclosure requirements directly served three substantial government interests. First, they served to provide information to the electorate; second, they deterred actual corruption and the appearance of corruption by exposing contributions and expenditures to the light of publicity; and third, they served a recordkeeping function allowing officials to gather information to determine whether contribution limits had been met. *Id.* at 66-68.

Disclosure laws necessarily burden the right to anonymity. As the Supreme Court recognized in *Buckley*:

> It is undoubtedly true that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute. In some instances, disclosure may even expose contributors to harassment or retaliation. These are not insignificant burdens on individual rights, and they must be weighed carefully against the interests which Congress has sought to promote by this legislation. In this process, we note and agree . . . that disclosure requirements certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist.

---

Violations of the recordkeeping and reporting requirements subjected the offender to misdemeanor charges. *Id.* at 63-64.

*Id.* at 68 (footnotes omitted).

Though it found the disclosure and reporting requirements of FECA constitutional, the *Buckley* Court left the door open to a challenge that a disclosure requirement could be unconstitutional "as applied" to plaintiffs who could demonstrate that disclosure would expose them to "'economic reprisal, loss of employment, threat of physical coercion and other manifestations of public hostility.'" *Id.* at 69 (quoting *NAACP v. Alabama*, 357 U.S. 449, 462 (1958) (discussing uncontested types of harm suffered by NAACP members after their identities were disclosed)). The Court found such a case in *Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87 (1982), where the Socialist Workers Party produced "substantial evidence of both governmental and private hostility toward and harassment of SWP members and supporters." *Id.* at 91. The Supreme Court held that because the Socialist Workers Party had demonstrated a reasonable probability that disclosure would subject those identified to harassment and threats of reprisals, the disclosure law at issue was unconstitutional as applied. *Id.* at 102.

Further development of the law came in 1995, when the Supreme Court decided *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995). There, the Court faced a broadly written Ohio statute which applied the disclosure requirement not only to expenditures for communications expressly advocating the election or defeat of a candidate but also to all speech designed "to promote the adoption or defeat of any issues."[16] The challenge was brought by Margaret

---

[16]   The statute provided:

McIntyre, a lone pamphleteer who was cited outside a public meeting for handing out leaflets expressing her opposition to a referendum on a school tax levy. Some of her handbills had her name on them; some were signed "concerned parents and tax payers."

Noting a long and illustrious tradition of anonymous works, including the Federalist Papers, the Supreme Court recognized that "an author's decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment." *Id.* at 342. The *McIntyre* Court also acknowledged that anonymity "provides a way for a writer who may be personally unpopular to ensure that readers will not prejudge her message simply because they do not like its proponent." *Id.* at 342. The *McIntyre* Court distinguished *Buckley* on several grounds, including: 1) that Mrs. McIntyre's speech was about a ballot issue rather than a candidate election; 2) that the Ohio law effectively regulated all political speech; and 3) that Mrs. McIntyre was acting independently. *Id.* at 355-56. The Supreme Court found that the state's interests in preventing fraud and providing

---

No person shall write, print, post, or distribute, or cause to be written, printed, posted, or distributed, a notice, placard, dodger, advertisement, sample ballot, or any other form of general publication which is designed to promote the nomination or election or defeat of a candidate, or to promote the adoption or defeat of any issue, or to influence the voters in any election, or make an expenditure for the purpose of financing political communications through newspapers, magazines, outdoor advertising facilities, direct mailings, or other similar types of general public political advertising, or through flyers, handbills, or other nonperiodical printed matter, unless there appears on such form of publication in a conspicuous place or is contained within said statement the name and residence or business address of the chairman, treasurer, or secretary of the organization issuing the same, or the person who issues, makes or is responsible therefor.

*Id.* at 338 n.3.

the electorate with information were insufficient to justify Ohio's open-ended law. *Id.* at 356.

The Court revisited its First Amendment jurisprudence in the recent case of *Citizens United v. Federal Election Commission*, 558 U.S. 301, 130 S. Ct. 876 (2010), where it reversed its position on independent expenditures by corporations. For purposes of the present case, *Citizens United* is important because in Part IV of the Court's opinion it revalidated the constitutionality of disclosure requirements by an eight to one vote. Disclosure requirements were distinguished from laws which "burden the ability to speak," because they "'impose no ceiling on campaign-related activities' and 'do not prevent anyone from speaking.'" *Id.* at 914 (quoting *Buckley*, 424 U.S. at 64 and *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 201 (2003)). Applying exacting scrutiny, the Court found the government's informational interest sufficiently important. "[T]he public has an interest in knowing who is speaking about a candidate shortly before an election . . . the informational interest alone is sufficient to justify [application of the disclosure requirement], it is not necessary to consider the Government's other asserted interests." *Id.* at 915-16. *Citizens United* also kept the door open for an "as applied" challenge, but rejected the plaintiff's as-applied challenge because it had neither shown evidence of "threats or reprisals" nor demonstrated any "harassment or retaliation." *Id.* at 916. None of the eight justices who joined Part IV of the *Citizens United* opinion addressed *McIntyre's* anonymity language.[17]

---

[17]    Justice Thomas dissented from Part IV in part because the majority ignored *McIntyre's* concern for anonymous speech. *Id.* at 980.

In *National Organization for Marriage v. McKee*, 649 F.3d 34 (1ˢᵗ Cir. 2011), the First Circuit upheld section 1014 against a facial First Amendment challenge. "'*Citizens United* has effectively disposed of any attack on Maine's attribution and disclaimer requirements.'" *Id.* at 61 (quoting *Nat'l Org. for Marriage v. McKee*, 723 F. Supp. 2d 245, 267 (D. Me. 2010)). Applying exacting scrutiny, the First Circuit held that:

> The requirements are minimal, calling only for a statement of whether the message was authorized by a candidate and disclosure of the name and address of the person who made or financed the communication. These are precisely the requirements approved in *Citizens United*, and they bear a close relation to Maine's interest in dissemination of information regarding the financing of political messages. The disclaimer and attribution requirements are, on their face, unquestionably constitutional.

*Nat'l Org. for Marriage*, 649 F.3d at 61 (citations omitted). The Court discussed Maine's informational interest, which it found sufficiently important to justify section 1014:

> In an age characterized by the rapid multiplication of media outlets and the rise of internet reporting, the "marketplace of ideas" has become flooded with a profusion of information and political messages. Citizens rely ever more on a message's source as a proxy for reliability and a barometer of political spin. Disclosing the identity and constituency of a speaker engaged in political speech thus "enables the electorate to make informed decisions and give proper weight to different speakers and messages."

*Id.* at 57 (quoting *Citizens United*, 130 S. Ct. at 916). *See also First Nat'l Bank v. Bellotti*, 435 U.S. 765, 791-92 (1978) ("[T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting

arguments. They may consider, in making their judgment, the source and credibility of the advocate.").

The Plaintiff argues that section 1014 is unconstitutional as applied to him. In order to pass through that door, *Citizens United* and *Buckley* require that a plaintiff show a "reasonable probability" that compelled disclosure would have subjected him to "threats, harassment, or reprisals from either Government officials or private parties." *Buckley*, 424 U.S. at 74. *See, e.g., Brown*, 459 U.S. at 102 (disclosure requirements unconstitutional as applied to Socialist Workers Party); *ProtectMarriage.com v. Bowen*, No. 2:09-cv-00058-MCE-DAD, 2011 WL 5507204, at *14 (E.D. Cal., Nov. 4, 2011) (rejecting as-applied challenge despite evidence of threats and harassment).

There is insufficient evidence in the record to support a reasonable inference that Bailey would have been subjected to threats, harassment, or reprisals from the state or private parties if forced to reveal his identity. In fact, after Bailey revealed himself as the author of the Cutler Files, the evidence in the record shows that he received at most four harassing voicemails, insufficient to support an as-applied challenge under *Buckley* or *Brown*, particularly as the callers objected to Bailey's choice to publish the Cutler Files anonymously, not his viewpoint or ideas.

Unlike the Social Workers Party in *Brown*, the Plaintiff has not shown that his viewpoint was rejected or unpopular. In fact, the majority of Mainers voted for

candidates other than Eliot Cutler.[18] Bailey states in his declaration that "I was concerned about personal and economic retaliation if my identity as the author of the Cutler Files was made public. I also knew that I was taking on a very public fight with a very wealthy powerful individual who might have been elected Governor." Bailey Declaration ¶¶ 46-47. Undercutting his concern about reprisals, however, is the July 6, 2010 post "Eliot Cutler Called Me A Whore" on Bailey's blog SavvySpin. This was a personal attack on Cutler for which Bailey made no attempt to hide his identity as author.

At oral argument, the Plaintiff's counsel conceded that Bailey had not suffered the type or degree of harm that *Citizens United* and *Buckley* said was necessary to support an as-applied challenge. *Citizens United*, 130 S. Ct. at 914 (threats, harassment, reprisals); *Buckley*, 424 U.S. at 659-60 (evidence of the sort proffered in *NAACP v. Alabama*). The Plaintiff instead argued that he should be allowed through the door held open for Mrs. McIntyre. Because he acted alone, the Plaintiff argued that his case should be governed by *McIntyre* not *Citizens United* and *Buckley*.

A number of courts have addressed the tension between *Citizens United* and *McIntyre*. In *Sampson v. Buecher*, 625 F.3d 1247 (10th Cir. 2010), the Tenth Circuit found that challenged disclosure requirements were unconstitutional as applied to a small group of individuals who opposed the annexation of their neighborhood. In so holding, the court focused on the difference between communications relating to

---

[18]    The Court takes judicial notice of the results of the November 2, 2010 general election: LePage 37.6%, Cutler 35.9%, Mitchell 18.8%. Bureau of Corporations, Elections & Commissions, Elections Div., General Election Tabulations, www.maine.gov/sos/cec/elec/2010/gen2010gov.html.

candidates versus those pertaining to ballot issues and distinguished *McIntyre* on the grounds that the state's informational interest in disclosure is more attenuated in ballot issue cases. *Id.* at 1255-57. *See also Hatchett v. Barland*, 816 F. Supp. 2d 583 (E.D. Wis. 2011) (finding disclosure requirement unconstitutional as applied to an individual advocating defeat of a ballot initiative).

In *Vermont Right to Life Committee, Inc. v. Sorrell*, No. 2:09-CV-188, 2012 WL 2370445, at *20 (D. Vt. June 21, 2012), the court pointed out that the Supreme Court in *McIntyre* applied strict scrutiny to the Ohio law rather than the exacting scrutiny it used in *Citizens United*. The court concluded that *McIntyre* is inapposite to mass media activities and electioneering communications. *In Many Cultures, One Message v. Clements*, 830 F. Supp. 2d 1111 (W.D. Wash. 2011), the court pointed out that the Ohio law in *McIntyre* was found to be "a regulation of pure speech," thus warranting strict scrutiny. *Id.* at 1161 n.27 (quoting *McIntyre*, 514 U.S. at 345). *See also Ctr. for Individual Freedom, Inc. v. Tennant*, 849 F. Supp. 2d 659 (S.D. W. Va. 2011).

In *Justice v. Hosemann*, 829 F. Supp. 2d 504 (N.D. Miss. 2011), a group of friends and neighbors, who pooled their money to purchase advertising in support of a ballot initiative, attempted to enjoin the state's reporting and disclosure laws. The district court upheld the state laws, distinguishing *McIntyre* on the grounds that the Ohio law banned speech, whereas the Mississippi requirements focused on expenditures. *Id.* at 514. In *Worley v. Roberts*, 749 F. Supp. 2d 1321 (N.D. Fla. 2010), the court refused to extend *McIntyre* to radio advertisements that a group of

four people were attempting to air anonymously. The *Worley* court discussed the fact that Mrs. McIntyre acted independently of anyone else and also pointed out that the *McIntyre* Court specifically limited its opinion to "only written communications and, particularly, leaflets of the kind Mrs. McIntyre distributed." *Id.* at 1327 (quoting *McIntyre*, 514 U.S. at 338 n.3.)

This case is distinguishable from *McIntyre* in several ways. First, section 1014 is not comparable to the Ohio law at issue in *McIntyre*. It is a narrowly drawn expenditure-based law dealing with express advocacy of candidates rather than communications related to ballot initiatives. Second, Bailey was expressly advocating the defeat of a candidate for Governor shortly before an election. Third, the Plaintiff is no Mrs. McIntyre. Bailey is a well-known political figure in Maine who was a paid consultant on two separate campaigns during the 2010 gubernatorial election, and who was working for an opposing candidate when he posted the Cutler Files. Fourth, given his association with the other campaigns, it can hardly be said that Bailey acted independently in the same sense that Mrs. McIntyre acted. He had the assistance of the husband of another candidate from the primary election. Fifth, the Cutler Files's attribution claim that it was created by individuals "not . . . affiliated with any candidate" was false. Finally, during the two months that the Cutler Files was available online, visitors to the site made 46,989 page requests. Although the Plaintiff acted alone to post the site and spent a relatively small amount of money to do so, his message was heard far and wide. The State's interest in an informed electorate is near its zenith where a widely-viewed

website falsely claiming to be written by journalists unaffiliated with any campaign expressly advocates the defeat of an opposing candidate shortly before a state-wide election.

The Court concludes that *Citizens United* and *Buckley,* rather than *McIntyre,* are the appropriate precedents to follow in this case. For election advocacy, the balance between the state's informational interest in attribution and a speaker's right to remain anonymous tips in the speaker's favor when a speaker can show that remaining anonymous is necessary to protect him from threats, harassment and reprisals. The balance does not tip in favor of a high-profile political actor who wishes, on the eve of an election, to criticize a gubernatorial candidate anonymously.

Allowing voters to know the person responsible for political communications so that they can judge a communication's reliability is exactly why the Maine legislature passed section 1014 and why the law was upheld in *National Organization for Marriage.* Maine's disclosure requirements are narrowly drawn and the least restrictive way to further the State's substantial informational interest. The Plaintiff has not established facts in the record sufficient to show that the law is unconstitutional as applied to him. The Defendants are entitled to summary judgment on Count I.

### C.   Count III: Equal Protection Challenge to Section 1012 Application

In Count III, the Plaintiff alleges that the Commission's determination that the Cutler Files was not entitled to the press exemption violated the Equal

Protection Clause of the Fourteenth Amendment,[19] Article I, Section 6-A of the Maine Constitution,[20] and 42 U.S.C. § 1983. The Equal Protection Clause of the Fourteenth Amendment prohibits states from treating similarly situated people differently unless the state can provide a sufficiently important reason for the different treatment.

The courts apply rational basis scrutiny to most laws, requiring only a rational relationship between the law and any legitimate state purpose. *E.g. Williamson v. Lee Optical*, 348 U.S. 483 (1955); *Massachusetts v. U.S. Dept. of Health and Human Servs.*, 682 F.3d 1, 9 (1st Cir. 2012). Laws that treat people differently according to their race, national origin or alienage, or laws that interfere with the exercise of a fundamental right, such as freedom of speech, must meet strict scrutiny, which requires that the state prove that its classification is narrowly tailored to serve a compelling government purpose. *E.g. Police Dept. of City of Chi. v. Mosley,* 408 U.S. 92, 101 (1972).

The parties disagree about the appropriate level of scrutiny. The Plaintiff argues that strict scrutiny is required because the law impinges on fundamental rights protected by the First Amendment. The Commissioner argues that there need only be a rational relation to a legitimate state purpose because the press exemption does not prohibit speech, but only reduces the requirements which the

---

[19]   "No state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

[20]   "No person shall be . . . denied the equal protection of the laws, nor be denied the enjoyment of that person's civil rights or be discriminated against in the exercise thereof." Maine Const. art. 1, § 6-A. The equal protection clauses of the United States Constitution and the Maine Constitution provide co-extensive protection. *Town of Frye Island v. State*, 94 A.2d 1065, 1069 (Me. 2008).

press must meet in order to speak. The Court sidesteps the question of which standard of scrutiny applies, because, as discussed below, the Plaintiff is not similarly situated to other press entities.[21]

The Plaintiff's argument begins with the premise that the press exemption applies only to traditional media and does not apply to those who publish on the internet or those who are not paid journalists. The Plaintiff then argues that citizen journalists who publish on the internet are subject to a more burdensome set of rules than the traditional media. According to the Plaintiff, since both groups are producing the same content, i.e., news stories, commentary and editorials, the two groups are similarly situated, and there is no adequate justification for the disparity in the rules which apply to them.

However, the Plaintiff's underlying premise is faulty. The press exemption on its face does not categorically exclude internet publications from its protection.[22] Nor does the exemption require that the disseminator of the communication be a

---

[21]    The Court notes that the press occupies a unique and important role in American society. It "serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. Alabama,* 384 U.S. 214, 219 (1966). The Maine press exemption closely tracks the federal exemption, which was enacted to ensure that news broadcasters and publishers would not be discouraged from serving their crucial societal role by the enactment of campaign finance laws. In enacting the federal press exemption, Congress explained that it did not want "to limit or burden in any way the first amendment freedoms of the press" and that it wanted "to assure the unfettered right of the newspapers, TV networks, and other media to cover and comment on political campaigns." H.R. Rep. No. 93-1239, p. 4 (1974). *See also Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 667-78 (1990), *rev'd,* 130 S. Ct. 876 (2010); *Fed. Election Comm'n v. Phillips Publ'g, Inc.*, 517 F. Supp. 1308, 1312 (D.D.C. 1981) (analyzing the federal press exemption). The State's interest in insuring that election coverage and commentary by the press is not constrained is a compelling interest. Based on the Commission's interpretation of the press exemption to include news, editorial, and commentary from the internet equivalents of broadcast stations, newspapers, magazines and periodical publications, discussed *infra,* the press exemption would seem to have the requisite fit to withstand strict scrutiny.

[22]    Section 1014 expressly applies to communications contained in "publicly accessible sites on the Internet." 21-A M.R.S.A. § 1014(1).

paid professional journalist. Section 1012(3)(B)(1) merely provides that to fall within the press exemption "any news story, commentary or editorial be distributed through the facilities of any broadcasting station, newspaper, magazine or other periodical publication."

Nothing in the Commission Determination suggests that the Commission excluded the Plaintiff from the press exemption because he either published on the internet or because he was a citizen journalist. The Commission confirmed at oral argument that it takes the position that news stories, commentaries or editorials posted on the internet would fall within the press exemption as long as they were disseminated by broadcasting stations, newspapers, magazines or other periodical publications.[23]

The Plaintiff has a difficult time understanding the concept that an internet publication could fall within the press exemption.[24] Yet the Federal Election Commission (FEC) has interpreted its own, almost identically-worded exemption[25] to include internet media for years. "[T]he media exemption applies to media entities that cover or carry news stories, commentary, and editorials on the

---

[23]     The Court takes judicial notice of the fact that many of the television broadcast networks and newspapers in Maine have online components. The Commission indicated that these facilities fall within the press exemption.

[24]     "Web sites are not published through broadcast stations, they are not newspapers, and they are not magazines or journals or other periodicals." Plaintiff's Response to Defendants' Motions for Summary Judgment at 9 (Doc. 78).

[25]     The federal press exemption is essentially identical to section 1012. It provides:

     The term expenditure does not include . . . any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate . . . .

2 U.S.C.A. § 431(9)(B)(i).

Internet, just as it applies to media entities that cover or carry news stories, commentary, and editorials in traditional media." 71 Fed. Reg. 18589-01, 18609 (April 12, 2006) ("The Commission finds as a matter of law that the media exemption applies to the same extent to entities with only an online presence as to those with an offline component as well."); F.E.C. Advisory Opinion 2005-16 at 5 (concluding that the Fired Up blog carrying news stories, commentary, and editorials qualifies as a press entity for purposes of the federal press exemption because its websites "are the online equivalent of a newspaper, magazine, or other periodical publication").

The Commission declined to apply the press exemption to the Cutler Files because the Cutler Files website was not the online equivalent of a broadcast station, newspaper, magazine or other periodical publication, not because the Cutler Files was created by a citizen journalist and published on the internet. The Commission found that the Cutler Files lacked the earmarks of a periodical publication:

> The content of the Cutler Files website was entirely dedicated to the single topic of gubernatorial candidate Eliot Cutler. The website existed for a specific and limited time only. It first appeared just prior to the gubernatorial election and was taken down shortly before the election. The Cutler Files website did not have any of the indicia of a periodical publication that may be exempted from the definition of "expenditure" in 21-A M.R.S.A. § 1012(3)(B)(1).

Commission Determination at 7 (Doc. 70-56).

In determining whether the Cutler Files was entitled to the press exemption the Commission focused on the website's form, which is exactly what the

Commission was required to do.[26] The Supreme Court has held that an inquiry into form is essential to determine whether a publication should be considered a campaign advertisement or a press publication. *Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238 (1986) ("**MCFL**"). In *MCFL*, an anti-abortion advocacy organization irregularly published the "Massachusetts Citizens for Life Newsletter," which contained appeals for contributions and volunteers, information on the organization's activities, and updates on anti-abortion political activity in the state. Prior to the September 1978 primaries, MCFL published a "special edition" of its newsletter that endorsed certain candidates who supported the anti-abortion cause. The Supreme Court rejected MCFL's claim that the special edition was entitled to the federal press exemption and exempt from FECA's restrictions on spending. The Court observed that the special edition was

> not published through the facilities of the regular newsletter, but by a staff which prepared no previous or subsequent newsletters . . . No characteristic of the Edition associated it any way with the normal MCFL publication. The MCFL masthead did not appear on the flyer, and, despite an apparent belated attempt to make it appear otherwise, the Edition contained no volume and issue number identifying it as one in a continuing series of issues.

*Id.* at 250-51. The Court continued:

> MCFL protests that determining the scope of the press exemption by reference to such factors inappropriately focuses on superficial considerations of form. However, it is precisely such factors that in combination permit the distinction of campaign flyers from regular publications. We regard such an inquiry as essential . . . .

---

[26]    The Court disagrees with the Plaintiff that it is inappropriate to focus on the form of the publication. The Plaintiff argues that: "Speech is speech, news is news, and commentary is commentary regardless of form and regardless of whether published on a continuous basis or published only on a website." Plaintiff's Reply at 10 (Doc. 88).

*Id.* at 251.

The Commission followed the appropriate inquiry when it determined that the Cutler Files did not fit the press exemption because it could not be considered a "periodical publication." The FEC has shed light on the evolution of the term "periodical" in the federal press exemption. In 1980, "periodical publication" was defined by the FEC as "a publication in bound pamphlet form appearing at regular intervals (usually either weekly, bi-weekly, monthly or quarterly) and containing articles of news, information, or entertainment." 71 Fed. Reg. 18589-01 at 18610 (discussing FEC Advisory Opinion 1980-109 (James Hansen)). In 2006, recognizing the need for a more "dynamic definition of periodical publication" to keep up with changing technology, the FEC distinguished its 1980 advisory opinion stating:

> with the advent of the Internet, frequent updating of the content of a website has become commonplace and is not tied to a publishing schedule but to the fast pace of breaking news and the availability of information. The Commission finds that the term "periodical" within the meaning of the Act's media exemption ought not be construed rigidly to deny the media exemption to entities who update their content on a frequent, but perhaps not fixed, schedule. Nor can "periodical publication" be restricted to works appearing in a bound, pamphlet form . . . The Commission notes that media entities such as WashingtonPost.com and Drudgereport.com, as well as many blogs, are updated throughout the day and function consistent with a dynamic definition of periodical publication.

*Id.* The FEC has declined to exempt all blogging activity under the federal press exemption, noting that "an exemption for one technology-specific category would be both too broad and too narrow: it would apply equally to blogging activity 'that [is] not involved in the regular business of imparting news to the public' and

communications that are not news stories, commentary or editorials within the meaning of the media exemption." *Id.* (quoting *McConnell*, 540 U.S. at 208).

The Plaintiff points out that unlike the FEC, the Commission had no rules governing the interpretation of the press exemption and that it cannot now adopt the interpretation used by the FEC. The Court disagrees. "Agencies are not required to promulgate rules defining every statutory term that might be called into question. They are expected to apply statues within their expertise as cases arise." *Cobb v. Bd. Of Counseling Prof'ls,* 896 A.2d 271, 278 (Me. 2006). This is not a case where a post hoc rationalization is being applied to justify an agency's action. As its Determination makes clear, the Commission withheld the press exemption from the Plaintiff not because he published on the internet or because he was a citizen journalist, but because his website did not meet the definition of a periodical publication.

Finally, the Plaintiff contends that he was similarly situated to a periodical publication and therefore should have been treated as a periodical. The Plaintiff focuses on the fact that he updated the Cutler Files six times between August 30, 2010 and September 29, 2010. The Plaintiff also argues that he would have kept publishing had he been allowed to continue anonymously. It is clear under *MCFL* that courts must look to a combination of factors pertaining to the form of a publication to distinguish "campaign flyers from regular publications." *MCFL,* 479 U.S. at 251.

The Court finds it relevant that at the time of the publication, Bailey was a paid political consultant for an opposing candidate. The Court also finds it pertinent that Bailey took down the website after only two months. Bailey claims that he discontinued the site only because the Commission would not allow him to publish it anonymously and not because the mission of the Cutler Files was complete. At the summary judgment stage, the Court must draw all inferences favorable to the nonmovant, but the Court finds that the inference that Bailey asks the Court to draw — that he only took the website down because he could not publish anonymously — is not reasonable on this record. The evidence supports the inference that Bailey never intended the site to run after the election. The home page of the Cutler Files stated: "Over *the next several weeks*, THE SECRET FILE ON ELIOT CUTLER will reveal the facts about his life, facts you'll find nowhere else, to help voters see the full picture of the man . . . ." It was clearly the goal of the site to convince voters that Cutler was not fit to be governor, a goal that would become moot after the election. DJSMF ¶ 129 (emphasis added). The record also establishes that the research on Cutler was completed by the summer of 2010, and there is no evidence that Bailey had more content ready to go or that he was continuing to research and write additional pieces on Cutler to be posted after the election. Finally, the record contains evidence that the website was taken down on the day that the web hosting fees for November would have been due

This case could well have come out differently if the Cutler Files had any sort of track record before it appeared on August 30, 2010, or if it had extended beyond

its two month run. But the undisputed facts of this case establish that the Cutler Files was more like a negative campaign flyer than a periodical publication.[27]  The website was established for the sole purpose of advocating the defeat of a single candidate for election, and it was published immediately before an election by an individual working for an opposing candidate. As such, it rightfully did not fall within the press exemption for a periodical publication.[28]

Because there is no evidence in the record to support Plaintiff's assertion that the Commission treated the Plaintiff differently because he was either an unpaid journalist or because he used the internet to post his message, and because the Cutler Files form is far more like a negative campaign advertisement than a periodical publication, the Defendant's Equal Protection argument fails. The Defendants are entitled to summary judgment on Count III.

### D.   Count IV: First Amendment Challenge to Application of Section 1014 (the *De Minimis* Argument)

In Count IV, Bailey alleges that his expenditures in aggregate were *de minimis,* and the application of section 1014 to his *de minimis* expenditure violates the First Amendment. In contrast to the reporting requirements of section 1019-B,

---

[27]    At oral argument, the Commission noted that press entities who are entitled to the exemption are not anonymous. They generally have a masthead which identifies the individuals who are responsible for their content. The Court does not consider this factor, however, because the press exemption itself does not contain any requirement that an entity have a masthead or that it honestly disclose its authors, and there is no evidence in the record that those who benefit from the exemption have all met this criteria.

[28]    As the Commission pointed out at oral argument, even the print media must follow the disclosure requirements when they engage in campaign activity. For example, if they distribute campaign literature as an insert, that material must comply with section 1014. 21-A M.R.S.A. § 1014(3-B). *See Reader's Digest Assoc. Inc. v. FEC,* 509 F. Supp. 1210, (S.D.N.Y. 1981)(magazine publisher acting in a manner unrelated to its publishing function would not fall within press exemption.)

which has a $100 threshold, section 1014 applies to any expenditure for a qualifying communication.

In *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26 (1st Cir. 1993), Vote Choice, Inc. brought a First Amendment challenge to Rhode Island's first dollar disclosure requirement for PAC contributions — which require disclosure for even *de minimis* contributions to campaigns. The First Circuit examined the requirement and found that the first dollar disclosure requirement did not violate free speech. The First Circuit observed that:

> [S]ignals are transmitted about a candidate's positions and concerns not only by a contribution's size but also by the contributor's identity. Since the identity of a contributor is itself informative, quite apart from the amount of the contribution, a candidate's ideological interests may often be discerned as clearly from a $1 contribution as from a $100 contribution. Hence, we conclude that there is a substantial link between data revealed by first dollar disclosure and the state's compelling interest in keeping the electorate informed about which constituencies may command a candidate's loyalties.

*Vote Choice*, 4 F.3d at 32 (citations omitted). However, "decisions about 'the appropriate level at which to require recording and disclosure' are 'necessarily . . . judgmental' and therefore, best left to legislative discretion. Consequently so long as legislatively imposed limitations are not 'wholly without rationality,' courts must defer to the legislative will." *Id.* (quoting *Buckley*, 424 U.S. at 83) (citation omitted). The First Circuit concluded that "[b]ecause the notion of first dollar disclosure is not entirely bereft of rationality – as we have already indicated, such a requirement relates to at least one sufficiently cogent informational goal – any general embargo against first dollar disclosure statutes would be inconsistent with the *Buckley*

Court's insistence upon judicial deference to plausible legislative judgments." *Vote Choice,* 4 F.3d at 33.

The Plaintiff points the Court to *Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth*, 556 F.3d 1021 (9th Cir. 2009), where the Ninth Circuit upheld a challenge to Montana's reporting requirements for political committee expenditures as applied to a *de minimis* economic effort in support of a ballot initiative. The disclosure requirements at issue were justified by the state's informational interests, *id.* at 1032, but the Ninth Circuit ultimately concluded that as applied to the church's *de minimis* in-kind expenditure the disclosure requirements were unconstitutional. At issue was whether the use of the Church's facilities to obtain signatures for a referendum on the definition of marriage and the pastor's time spent urging members of the church to sign the petition constituted an expenditure.

> As a matter of common sense, the value of this *financial* information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level. As the monetary value of an expenditure in support of a ballot issue approaches zero, financial sponsorship fades into support and then into mere sympathy.

*Id.* at 1033. The Ninth Circuit focused on the fact that the case involved in-kind expenditures. It added that "we are not concerned with – and express no view about – the constitutionality of Montana's disclosure requirements in the context of candidate elections or as applied to monetary contributions of any size." *Id.* at 1034. *See Family PAC v. McKenna*, 685 F.3d 800, 810 (9th Cir. 2012) ("we are not aware of

any judicial decision invalidating a contribution disclosure requirement, or holding that a contribution disclosure threshold was impermissibly low").

The Court does not foreclose the possibility that in the appropriate case an expenditure could be so *de minimis* that application of the disclosure requirements would not be constitutional, but this is not that case. The Plaintiff's expenditures for the Cutler Files were over $90.[29] The Plaintiff has failed to establish facts sufficient to support a reasonable inference that the Cutler Files website represented a *de minimis* expenditure. The Defendants are entitled to summary judgment on Count IV.

## II.   Count  II & V: Review of Agency's Decisions

### A.   Standard of Review – 80C Appeal

For purposes of Counts II and V, the Plaintiff's appeal of the Commission's actions under Maine Rule of Civil Procedure 80C, the Court acts in a quasi-appellate capacity and is limited to the agency record. 5 M.R.S.A. § 11006 ("[j]udicial review shall be confined to the record upon which the agency decision was based"); Me. R. Civ. P. 80(C)(d). The Court may reverse or modify an agency's decision where the

> [A]dministrative findings, inferences, conclusions or decision are:
>
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Affected by bias or error of law;

---

[29]    Section 1019-B places a significant reporting burden on persons making expenditures over $100. The Plaintiff argues that because § 1019-B has a $100 threshold, an expenditure under § 1014 under $100 is *de minimis*. This argument mixes apples and oranges and completely disregards the State's recordkeeping interest.

(5) Unsupported by substantial evidence on the whole record; or
(6) Arbitrary or capricious or characterized by abuse of discretion.

5 M.R.S.A. § 11007(4)(C). "In reviewing the decisions of an administrative agency, we do not attempt to second-guess the agency on matters falling within its realm of expertise and limit our review to determining whether the agency's conclusions are unreasonable, unjust or unlawful in light of the record." *Imagineering, Inc. v. Superintendent of Ins.*, 593 A.2d 1050, 1053 (Me. 1991).

In Count II of the Complaint, the Plaintiff alleges that the Commission's determination that the Cutler Files was not entitled to the press exemption was in excess of the Commission's statutory authority, an error of law, and arbitrary and capricious. In Count V, the Plaintiff alleges that the Commission made a legal error and abused its discretion because it penalized Bailey for not stating that the Cutler Files website was not authorized by a candidate even though Bailey cured the defect within 10 days of notice from the Commission.

### B.   Count II: Commission's Press Exemption Determination Under 5 M.R.S.A. 11007(4)(C)

#### 1.   Excess of Statutory Authority

The Commission's duties include the administration and investigation of "any violations of the requirements for campaign reports and campaign financing." 1 M.R.S.A. §1008. "The commission may undertake audits and investigations to determine the facts concerning . . . expenditures by a person, candidate, treasurer, political committee or political action committee." 21-A M.R.S.A. § 1003. The Commission also has the authority to assess monetary penalties authorized in

chapter 13, which includes section 1014. 21-A M.R.S.A. § 1004-A. The Commission did not exceed its statutory authority.

### 2.   Error of Law

Before the Court is the Commission's interpretation of the press exemption and its conclusion that "[t]he Cutler Files website did not have any of the indicia of a periodical publication that may be exempted from the definition of 'expenditure' in 21-A M.R.S.A. § 1012(3)(B)(1)." Commission Determination at 7.

> When a case concerns the interpretation of a statute that an administrative agency administers and that is within its area of expertise, our scope of review is to determine first whether the statute is ambiguous. If the statute is unambiguous, we do not defer to the agency's construction, but we interpret the statute according to its plain language. If the statute is ambiguous, we defer to the agency's interpretation, and we affirm the agency's interpretation unless it is unreasonable.

*Cobb*, 896 A.2d at 275 (citations omitted). "Agencies are not required to promulgate rules defining every statutory term that might be called into question. They are expected to apply statutes within their expertise as cases arise." *Id.* at 278. As previously discussed, the Court agrees with the Commission's determination that the Cutler Filers was not a periodical publication.

### 3.   Arbitrary and Capricious

The Plaintiff also challenges the Commission's factual findings as arbitrary and capricious. Administrative findings of fact are not "arbitrary and capricious" if they "are supported by substantial evidence in the record, even if the record contains inconsistent evidence or evidence contrary to the result reached." *Friends of Lincoln Lakes v. Bd. of Envtl. Prot.*, 989 A.2d 1128, 1133 (Me. 2010). "An

administrative decision will be sustained if, on the basis of the entire record before it, the agency could have fairly and reasonably found the facts as it did. The issue before us is not whether we would have reached the same conclusion as the agency, 'but whether the record contains competent and substantial evidence that supports the result reached.'" *CWCO, Inc. v. Superintendent of Ins.*, 703 A.2d 1258, 1261 (Me. 1997) (quoting *In re Maine Clean Fuels, Inc.*, 310 A.2d 736, 741 (Me. 1973)) (citations omitted). The Court can only vacate the agency's facts if the record "compels contrary findings." *Kroeger v. Dep't of Envtl. Protection*, 970 A.2d 566, 569 (Me. 2005).

In its findings of fact, the Commission concluded that the Cutler Files website did not have "any of the indicia of a periodical publication that may be exempted from the definition of 'expenditure' in 21-A M.R.S.A. § 1012(3)(B)(1)." Commission Determination at 7. To support this conclusion, the Commission found that "[t]he website existed for a specific and limited time only. It appeared just prior to the gubernatorial election and was taken down shortly before the election." *Id.* The Commission found that "[a]dditional pages on different topics were added in the weeks leading up to the November 2, 2010 general election." *Id.* at 3. The Commission also found that "the website had no other reasonable meaning than to urge Cutler's defeat," and "was entirely dedicated to the single topic of gubernatorial candidate Eliot Cutler." *Id.* at 4, 7. There is competent evidence in the record to support the Commission's finding that the Cutler Files was not a periodical publication. The Court concludes that the Commission's factual

conclusions were based on competent evidence in the record and were not arbitrary or capricious.

### C.    Count V

In Count V, the Plaintiff claims that the Commission made an error of law and abused its discretion because it penalized Bailey for failing to comply with Section 1014's disclosure requirements even though he cured the violation within ten days of being notified by the Commission. The Court need not reach this claim because the Commission's $200 penalty was supported by its finding that Bailey violated the attribution requirement in violation of sections 1014(2) and (2-A).

### CONCLUSION

The Plaintiff has failed to establish evidence in the record sufficient for a reasonable jury to find for him on Counts I, III, or IV. Defendant Commission and Defendant-Intervenor Cutler's Motions for Summary Judgment on these counts is hereby **GRANTED** and Plaintiff's Motion for Summary Judgment on these counts is **DENIED**. The Plaintiff has also failed to establish any entitlement to reversal of the Commission's determinations. Therefore, Defendant Commission and Defendant-Intervenor Cutler's Motions for Summary Judgment on Counts II and V are hereby **GRANTED** and Plaintiff's Motion for Summary Judgment on these counts is **DENIED.**

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 30th day of September,  2012.

37